ORIGINAL
C/M
D{F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------x

OLIVER T. TOOKES,

                Plaintiff,        **MEMORANDUM AND ORDER**
                                                       Case No. 08-CV-1060 (FB) (RLM)

    -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY,

                Defendant.
------------------------------------------------------x

*Appearances:*
*For the Plaintiff:*                                     *For the Defendant:*
ERIC TURKEWITZ                             KARLA D. DENALLI
The Turkewitz Law Firm                   The Port Authority of New York &
228 East 45th Street, 17th Floor             New Jersey
New York, NY 10017                          225 Park Avenue South, 13th Floor
                                                        New York, NY

**BLOCK, Senior District Judge:**

        Oliver T. Tookes ("Tookes") suffered a fractured ankle after falling about 12 feet through a grate covering an access pit on the grounds of the Port Authority of New York and New Jersey's ("Port Authority") Bayonne Bridge Tollhouse. Tookes sued the Port Authority, and after a three-day trial a jury determined that the Port Authority's negligence was a substantial factor in causing his injuries, awarding him $300,000 in lost earnings, $50,000 in past non-economic damages, and $400,000 in future non-economic damages. The jury also determined, however, that Tookes's negligence was also a substantial factor in causing his injuries, finding him 40 percent at fault.

        Tookes now moves for judgment as a matter of law under Rule 50(b), or

alternatively for a new trial under Rule 59(a), arguing that the jury's comparative negligence determination was unsupported by the evidence. Tookes also moves for a new trial on the ground that the jury's $50,000 award for past non-economic damages was inadequate. Finally, the Port Authority moves for a collateral source hearing under N.Y. C.P.L.R. § 4545(a).[1]

For the reasons that follow, Tookes's motion with regard to the jury's contributory negligence determination is denied; Tookes's motion for a new trial with regard to past non-economic damages is granted unless the Port Authority stipulates to increase the award to $500,000; and the Port Authority's motion for a collateral source hearing is granted.

I

"Rule 50 enables the district court to enter judgment as a matter of law against a party on an issue only if there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, and permits the district court to do so after a jury verdict, provided a pre-verdict motion is properly renewed." *Nadel v. Isaksson*, 321 F.3d 266, 271-72 (2d Cir. 2003) (internal quotation marks and citations omitted). "The standard for post-verdict judgment as a matter of law is the same as for summary judgment under Fed. R. Civ. P. 56." *Cobb v. Pozzi*, 363 F.3d 89, 101 (2d Cir. 2004). Accordingly,

---

[1] This suit—brought pursuant to the federal courts' diversity jurisdiction—is governed by New York substantive law.

> [a] district court must deny a motion for judgment as a matter of law unless, viewed in the light most favorable to the nonmoving party, "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached."

Nadel, 321 F.3d at 272 (quoting *Cruz v. Local Union No. 3 of Intern. Bhd. of Elec. Workers*, 34 F.3d 1148, 1154-55 (2d Cir. 1994)) (alterations in original).

By contrast, the standard for granting a new trial under Fed. R. Civ. P. 59(a) is "less stringent" in two respects: "(1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner." *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (internal quotation marks omitted). "That being said, for a district court to order a new trial under Rule 59(a), it must conclude that the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice, i.e., it must view the jury's verdict as against the weight of the evidence." *Id.* at 245 (internal quotation marks omitted).

## II

### A. Contributory Negligence

Because Tookes's motion under Rule 50(b) and his motion under Rule 59(a) are denied, the Court will focus on Rule 59(a), "which has a less stringent standard[.]" *Manley*, 337 F.3d at 244 (focusing on Rule 59(a) analysis is more efficient when motions under both rules are denied).

Tookes argues that because he "was standing on the grate with the consent

3

of Ms. Gilligan, the senior management employee of the Port Authority on duty that night, and since she said Mr. Tookes did not act in any unusual ways (such as jumping up and down on the grate), there was no rationale for the jury's determination to place any fault with Mr. Tookes." Pl.'s Mem. of Law at 6-7 (footnote omitted). But contributory negligence "is a jury question in all but the clearest cases," *MacDowall v Koehring Basic Constr. Equip.*, 49 N.Y.2d 824, 827 (1980), and this is not such a case. The jury could have reasonably come to the conclusion that Tookes did not exercise due care and risked foreseeable injury when he stood atop the visibly rusty grate covering a 12-foot-deep access pit and used a "fishing pole" fashioned from a couple of coat hangers and a broom handle to attempt to fish his keys out through a window. After reviewing the evidence submitted at trial, the Court cannot say that "the jury [] reached a seriously erroneous result or . . . [that] the verdict [wa]s a miscarriage of justice." *Manley*, 337 F.3d at 245.

## B. Non-economic Damage Award

"Where damages are awarded on claims governed by New York law, a federal district court will apply the standard of review provided by New York's CPLR § 5501(c)." *Johnson v. City of New York*, No. 05-CV-7519, 2011 WL 2693234, at *5 (S.D.N.Y. Jun. 30, 2011) (citing *Gasperini v. Center for Humanities, Inc.*, 518 U.S. 415, 430-31 (1996)). Section 5501(c) states that a court "shall determine that an award is excessive or inadequate if it deviates materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). The "deviates materially" standard "requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts." *Patterson v.*

4

*Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing *Gasperini*, 518 U.S. at 424).

"To determine whether an award deviates materially from what would be reasonable compensation, New York state courts look to awards approved in similar cases." *Gasperini*, 518 U.S. at 425 (internal quotation marks omitted).² Similar cases are "not binding but instructive," *In re Asbestos Litig.*, 9 F. Supp. 2d 307, 311 (S.D.N.Y. 1998), because "no two cases are exactly the same," *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 438 (S.D.N.Y. 2008); *see also So v. Wing Tat Realty, Inc.*, 687 N.Y.S.2d 99, 101 (1st Dep't 1999) ("Modification of damages, which is a speculative endeavor, cannot be based upon case precedent alone, because comparison of injuries in different cases is virtually impossible.").

Dr. Nadubeeth Jayaram ("Dr. Jayaram") — Tookes's treating orthopedist — testified at trial that Tookes had sustained a Grade 3 open fracture in his ankle,³ which is

---

²The Seventh Amendment provides that: "the right of trial by jury shall be preserved, and *no fact tried by a jury shall be otherwise re-examined in any Court of the United States*, than according to the rules of the common law." U.S. Const. amend. VII (emphasis added). In *Dimick v. Shiedt*, 293 U.S. 474 (1935), the Supreme Court held that, in accordance with practice at common law and early federal cases, the Seventh Amendment allows "remittitur," but bars "additur" except in a few rare cases. *See id.* at 482-88. New York's additur and remittitur law, however, is substantive law that must be applied by a federal court sitting in diversity, and is not barred by the Seventh Amendment. *See Gasperini*, 518 U.S. at 431-39.

³Tookes also fractured his wrist, but his wrist injury was the lesser of his two injuries. In his wrist, Tookes fractured his "distal radius," meaning the part of his radius that is "further away from the trunk." Tr. 341. It was "an interarticular fracture, [meaning] it's going into the joint, damaging the cartilage." *Id.* Dr. Jayaram operated on Tookes's wrist, using an "external fixator" to keep his arm and wrist bones in place. *Id.* at 343. The external fixator required several pins to be inserted into Tookes's bones, and those pins were connected outside his body with rods and clamps.

5

the "more severe form of an open fracture." Tr. 335. The open wound in Tookes's skin was more than two centimeters wide, and "you could easily see the broken bone" through the opening. It was a bimanular fracture, meaning that Tookes had fractured both his tibia and fibula. He had also "completely torn" the ligaments of the ankle. *Id.* at 336.

Before operating on Tookes's ankle for the first time, Dr. Jayaram informed Tookes that because of the open wound and the severity of the fracture, "the chance of infection would be extremely high," and that he might develop arthritis. *Id.* at 337. During surgery, two pins and four screws were used to realign Tookes's ankle. Dr. Jayaram found during surgery that the "saphenous nerve," which "carries the sensation [in a] portion of the foot," had been "ripped [] off" by the sharp edge of one of Tookes's broken bones. *Id.* at 347-48. Damage to the saphenous nerve can cause a loss of feeling in part of the foot, and, if it does not heal correctly, a "neuroma" can form, which is "a very sensitive ending like a live wire," causing pain that feels "like electric shocks." *Id.* at 347. Moreover, the cartilage which "lubricates the joint, pushes on the joint, [and] prevent[s] pain[] when the ankle moves" was damaged. *Id.* at 347.

Tookes remained at the hospital for five days before being moved to a rehabilitation center for physical therapy to maintain some range of motion in his ankle. He was at the rehabilitation center for over a week before he was readmitted to the hospital because, as predicted, his ankle had become infected. Dr. Jayaram performed a second surgery on Tookes's ankle, cleaning and washing out the wound. After this surgery, Tookes went back to the rehabilitation center for six weeks before returning home.

6

After returning home, Tookes developed a neuroma due to the damage to his saphenous nerve which created "excruciating pain" when the "middle segment" of his foot was touched or tapped. *Id.* at 352. Dr. Jayaram performed a third surgery on Tookes's ankle, burying the torn end of the saphenous nerve inside a bone to get it "away from everything." *Id.* at 354.

About a year after Dr. Jayaram gave Tookes permission to return to work on light duty, Tookes experienced arthritic pain in his ankle. Tookes had developed "traumatic arthritis," meaning that the cartilage inside his ankle joint had "wor[n] out completely." *Id.* at 356. During a fourth surgery, Dr. Jayaram fused Tookes's ankle, filling in the area where the cartilage had been with bone graft from his hip, "completely eliminat[ing]" any motion in the ankle, but removing pain. *Id.* Tookes was left with a permanent limp.

In arguing that the jury's award for past non-economic damages was inadequate, Tookes provided eight allegedly comparable ankle fracture cases. Many are unhelpful because they involved dissimilar or undescribed injuries, *see Moller v. City of New York*, 880 N.Y.S.2d 225 (Sup. Ct. N.Y. County 2009) ($700,000 to 56-year-old for crushed heel); *Carl v. Daniels*, 702 N.Y.S.2d 279 (1st Dep't 2000) ($2,300,000 to 12-year-old for broken femur); *Holland v. Gaden*, 688 N.Y.S.2d 668 (2d Dep't 1999) ($500,000 for broken tibia and fibula in leg, not ankle); *Pierce v. City of New York*, 677 N.Y.S.2d 173 (2d Dep't 1998) ($500,000 for an ankle injury described only as a "serious permanent injury"), or because past non-economic damages were not separated from total damages, *see Brownell v. City of*

*New York*, 715 N.Y.S.2d 405 (1st Dep't 2000) ($709,222 total award to plaintiff in her 40s for a fractured tibia and fibula in her ankle, but no neuroma or ankle fusion).

Three of the cases Tookes identified provide guidance. In *Orellano v. 29 E. 37th St. Realty Corp.*, 772 N.Y.S.2d 659 (1st Dep't 2004), the jury awarded the plaintiff $2,500,000 for past non-economic damages, which were reduced to $500,000 by the trial court; the appellate court reduced the award further to $375,000. The 47-year-old *Orellano* plaintiff had badly fractured his tibia and fibula (it is unclear whether the break was in the leg or ankle), which required "several surgical procedures," a "two-month hospital stay," and "extensive physical therapy," but had not suffered a neuroma, arthritis, or had his ankle fused. *See Orellano*, 772 N.Y.S.2d at 659.

In *Patterson v. Kummer Dev. Corp.*, 755 N.Y.S.2d 180 (4th Dep't 2003), the appellate court reduced the jury's award for past pain and suffering from $750,000 to $500,000. The *Patterson* plaintiff had fractured his left tibia and fibula in his ankle, which required two surgeries and the insertion of multiple metal screws and a metal plate. He too, however, had not suffered a neuroma, arthritis, or had his ankle fused.

In *Morrisseau v. State*, 696 N.Y.S.2d 545 (3d Dep't 1999), the appellate court increased the jury's past pain and suffering award from $195,000 to $250,000. The plaintiff in *Morriseau* sustained an ankle fracture which required several surgeries, including an ankle fusion which rendered her permanently disabled. She did not, however, suffer from arthritis or a neuroma.

The Port Authority provided four allegedly comparable ankle fracture

cases — two jury verdicts, one arbitration, and one mediated settlement. These cases are not helpful, however, because they do not separate past non-economic damages from total damages. The Court notes that the total awards in these cases included one of $108,900 and three awarding between $700,500 and $775,000.

The Court's own search for comparable cases provides additional guidance, but like *Orellano*, *Patterson*, and *Morrisseau*, none describe injuries as severe as Tookes's. In *Ciano v. Sauve*, 840 N.Y.S.2d 415 (2d Dep't 2007), the appellate court increased the jury's award for past pain and suffering from $250,000 to $350,000. The *Ciano* plaintiff fractured his ankle and foot; titanium screws were used to secure the broken bones, and two additional surgeries were needed to "correct complications that arose." *Ciano*, 840 N.Y.S.2d at 416. Again, however, the plaintiff did not have a neuroma or arthritis; nor did he have his ankle fused.

In *Hopkins v. New York City Transit Auth.*, 917 N.Y.S.2d 866 (1st Dep't 2011), the appellate court affirmed the jury's award of $350,000 for past pain and suffering, where the plaintiff sustained an ankle fracture which required two surgeries — one to insert a metal plate and screws and another to remove them. As in *Ciano*, there was no neuroma, arthritis, or fused ankle.

Based on these cases, the Court finds that the jury's $50,000 award for past non-economic damages deviates materially from what would be reasonable compensation. Tookes underwent four ankle surgeries, had a pin and screws inserted into his ankle, suffered from a painful neuroma, and finally had to have his ankle fused to alleviate pain

caused by traumatic arthritis. Because Tookes's pretrial pain and suffering was more severe than that experienced by any of the plaintiffs in the comparable cases, $500,000 is warranted. Thus, the Court grants Tookes's motion for a new trial on past non-economic damages unless the Port Authority stipulates to increase the award to $500,000.

### C. Collateral Source Hearing

New York law provides that:

> In any action brought to recover damages for personal injury, . . . where the plaintiff seeks to recover for the cost of medical care, . . . loss of earnings or other economic loss, evidence shall be admissible for consideration by the court to establish that any such past or future cost or expense was or will, with reasonable certainty, be replaced or indemnified, in whole or in part, from any collateral source, except for life insurance and those payments as to which there is a statutory right of reimbursement. If the court finds that any such cost or expense was or will, with reasonable certainty, be replaced or indemnified from any such collateral source, it shall reduce the amount of the award by such finding[.] Any collateral source deduction required by this subdivision shall be made by the trial court after the rendering of the jury's verdict. The plaintiff may prove his or her losses and expenses at the trial irrespective of whether such sums will later have to be deducted from the plaintiff's recovery.

N.Y. C.P.L.R. § 4545(a). The Port Authority seeks to reduce the jury's verdict by the amount of federal and state disability benefits Tookes has received and will receive.

Tookes's expert testified that Tookes's economic loss was made up of $72,204 in past lost wages, $225,363 in future lost wages, and $73,752 in lost pension income, totaling $371,319 in economic damages. The jury, however, only awarded $300,000 in total economic damages.

10

"[A] direct correspondence between the item of loss and the type of collateral reimbursement must exist before the required statutory offset may be made." *Oden v. Chemung County Indus. Dev. Agency*, 87 N.Y.2d 81, 87 (1995). Tookes argues that because the verdict sheet "lumped together all of the economic loss, without objection by the Port Authority, it is impossible for the defendant to show which of the three economic categories the set-off pertains to." Pl.'s Mem. of Law at 5.

As the Port Authority correctly points out, however, by subtracting the $73,752 Tookes claimed as lost pension income from the $300,000 the jury awarded as economic damages, the remaining $226,248 constitutes the minimum the jury could have awarded for past and future lost wages; lost wages directly correspond to disability benefits. *See, e.g., Hayes v. Normandie LLC*, 761 N.Y.S.2d 645, 646 (1st Dep't 2003) ("Social Security payments received by plaintiff . . . were intended to compensate for lost earnings and thus properly treated as collateral source payments, the same cannot be said about plaintiff's pension benefits." (internal citations omitted)). Thus, the Port Authority is entitled to a collateral source hearing and the maximum set-off is capped at $226,248. The parties are encouraged to obviate the need for a collateral source hearing by agreeing on the amount of the set-off, and should advise the Court within two weeks if a hearing is still necessary, at which point the Court will set a date.

### III

Tookes's motion to set aside the jury's contributory negligence determination, or for a new trial on that issue, is denied; Tookes's motion for a new trial with regard to

past non-economic damages is granted unless the Port Authority stipulates to increase the award to $500,000; and the Port Authority's motion for a collateral source hearing is granted.

**SO ORDERED.**

s/ Judge Frederic Block

FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
August 10, 2011